The next case for argument is 15-1049, NuVasive v. Warsaw Orthopedic. And as we've already mentioned, what we understand we're left with are the counterclaims raised by you, Mr. Donnelly, I'm sorry, Mr. Quinn. And then Ms. Lateef is coming in, sort of on short notice, to respond to those arguments. That's right, Chief Judge Prost. May I please the Court, John O. Quinn, on behalf of Warsaw. And as the Court noted, based on the settlement between NuVasive and Warsaw, NuVasive's appeal has been dismissed. And the only issues that remain are those presented on what was Warsaw's cross-appeal in the 206 and 208 IPRs involving claims 1 through 8 and 17 through 23. The Board's finding of unpatentability with respect to those claims should be reversed or at least vacated for three independent reasons. First, the Board failed to address a key limitation that the implant have a length that was greater than the depth of the disc space. Second, the Board fundamentally erred in its reading of the Brannigan reference and whether it can substantially span the full width of the vertebra. And third, even if you accept the Board's reading with respect to Brannigan, the Board failed to give reasons why a person would have been motivated to combine the asserted references in the first place. As this Court recently reiterated in the Cutsworth v. Mode of Power case, quote, when the Board determines that modifications and combinations of prior art render a claimed invention obvious, the Board must fully explain why a person of ordinary skill in the art would find such changes obvious. And respectfully, the Board failed to do so here where you had specific techniques using specific tools, specific implants of specific requirements that the Board approached this much like a jigsaw puzzle in the way that this Court rejected in the In Touch case. So let me start with the Brannigan. Well, you have a separate argument with respect to Claims 17. We do, Judge Bryson. We do. We have a separate argument from all of those points with respect to Claims 17 through 23, and that's the idea that the Jacobson reference does not disclose elongated portions that are, quote, positioned over the adjacent vertebrae. That's just simply not there. The Board's entire analysis of that issue is at page A22. It's essentially five sentences, and the Board finds that Jacobson There's much more sentence than your argument for us. That may be fair, Judge Bryson. But the entirety of the Board's reasoning is that Jacobson discloses the elongated portions with its anchor wires, but it doesn't explain how Jacobson does that. And there's one of two ways that I think that the Board could have been reaching that conclusion. One is to say that those anchor wires, which are anchored in the disc capsule itself, are positioned over the adjacent vertebrae, and you face it essentially invited that Because of the geometry of the figure that Exactly. Because the spine is arched or it's tapered, and so if you drill down through the disc capsule, you would eventually hit rock bottom. And so under that theory, perhaps the Board thought that this was positioned over. That's an unusual reading of the term positioned over, and particularly where the whole point here is to create a channel for operating to be able to insert an implant. The Board doesn't say that it's reading Jacobson that way, so we just don't know what the Board did. And much as this Court recently did in the Ariosa case, where you don't know what the Board did, it is potentially based on an untenable reading of the claim, certainly not something that the Board adopted a claim construction. That alone would be reason to vacate and remand. It ties in, though, with another point. Jacobson, because of the way that the anchor wires work, Jacobson doesn't contemplate its process being used or its method being used with an implant. And indeed, the Board conceded as much at A-15. And yet, nonetheless, the Board seems to assume that a person of ordinary skill in the art would have been motivated to take the method disclosed by Jacobson and apply it to large implants, including those disclosed in Brannigan. The entirety of the Board's reasoning for combination of these references is at A-23 and 24. And the Board doesn't explain why. It does exactly what this Court has said that you can't do. It does what KSR says that you can't do. It seems to assume the conclusion and then work backwards from there. The approach is much like multi-reference anticipation. It looks out and says, this element is satisfied here, this element is met here, this element is met here, and then it offers the conclusion that a person of ordinary skill in the art would have found the results from the combination to be obvious or to yield anticipated results, expected results, without ever explaining why that would be so. Why would a person have been motivated, in the first instance, to try to implant, to insert an implant from the side as opposed to the traditional method from the front or from the back? And, of course, the invention of the 997 comes some 13 years after Jacobson's purported disclosure of a lateral process. Well, the motivation seems fairly apparent. I mean, you've got the nerves in the rear and the aorta in the front. So you're left with one approach, basically the side. So if you want to avoid complications such as that, there are other complications such as the bowel and so forth, but certainly that would be an approach that would suggest itself in light of those considerations and then Jacobson, in fact, went that way. Well, two points, Judge Bryson. First, you're absolutely right. That's what the 997 patent identifies as one of the motives for doing this. Another of the motives for doing this is so that you could have a larger, oversized implant to have enhanced stability. But Dr. Michelson specifically does talk about the presence of the major vessels and the spinal cord and avoiding those. That's at A103 of that patent. That's not mentioned anywhere in Jacobson. What Jacobson talks about, and you can see this at A485, Jacobson talks about not having to have the intrusive surgery that requires cutting away part of the lamina, that's part of the vertebra itself, and it's avoiding that which itself could potentially cause more pain than simply removing the herniation, which is what Jacobson is focused on. Jacobson is about a disectomy, where essentially you scoop out some material, not about inserting a large implant. It doesn't talk at all about moving the major vessels or avoiding having to move the major vessels, avoiding having to work around the spinal cord. Jacobson doesn't say a word about that. And yet, nonetheless, the board seems to assume that one would be motivated to make that combination. Respectfully, to take what motivated Dr. Michelson and then work backwards from that is exactly what this court and KSR said that you can't do, which is to use hindsight to retrace the path that the inventor had followed. But Dr. Michelson was not the first person to recognize that there was a problem with the spinal column and the aorta. That was known to everybody that had studied Grayson Anatomy. Well, that may be so, Judge Grayson, but Dr. Michelson was the first to come up with implants that were designed to be inserted laterally. And indeed, this court observed as much in the Warsaw versus Newvasive case of page 1370 that before Dr. Michelson came along, quote, implants were inserted either from the front or the back rather than the side. And so again, to work backwards some 13 years after Jacobson and say, oh, well, it would be obvious to do what Dr. Michelson did, frankly seems to assume the conclusion. And again, you can look at the board's opinion. There is no analysis as to the combination. I'd like to turn back, though, for a moment on the Brantigan reference itself, because the arguments that they make hinge on the notion that Brantigan would disclose, the arguments that Newvasiv had made, hinge on the notion that Newvasiv, excuse me, that Brantigan discloses an implant that would have the requisite dimensions. There is no analysis, nothing in the board's opinion talking about the requirement that the length be greater than the depth of the disk space. You can do a search through the board's opinion for the word depth. You will find it in citing the claim, in quoting the claims. But where do you raise that argument in court from here? Sure, we raised it in several places. You can find it at A1200 where we specifically reference a paragraph from Dr. Sachs' declaration, and that paragraph is at A1308 to 1309, and Dr. Sachs specifically in his declaration spells this issue out. It was also raised at the hearing before the board at A4809. In addition to the fact that the board does not address the depth limitation at all, does not mention it in addressing the Brantigan, the notion that Brantigan could meet that limitation, the board actually makes findings that are inconsistent with that. So for example, at A20, the board says, well, Brantigan can be inserted from any desired orientation. That necessarily means two things. Number one, it can't possibly have a length greater than the depth, because if it could be inserted from any possible orientation, then if you were to insert it from the front or the back, it would impair the major vessels or the spinal cord. The board doesn't grapple with that inconsistency. The other thing that that means with respect to Brantigan is it means that it can't have a length that is substantially the full width, the full transverse width of the vertebra. And that's another issue where the board's analysis falls short. We presented numerous arguments on why it is that when you read Brantigan, you cannot have something that substantially spans the full width, because it is bottomed on the end plate. It is a hard flat device with grooves in it that works by being bottomed on the end plate. The end plate does not substantially span the full width. The board instead concluded that the reason that Brantigan could meet this limitation is because of one sentence that the board quotes over and over, the quote, generally shaped and sized to conform with the disc space. And it says that in A16, 18, 19, and 20. And what the board did is the legal error that this court said you can't do in Panduit v. Dennison, is taking one sentence out of the reference and saying because of that one sentence, that it's generally sized and shaped to conform to the disc space, it must necessarily span the full transverse width. But that fails to look at substantially, which means approximately or not entirely. But that was the entire basis of the board's reasoning. It doesn't address, it doesn't respond to the argument that it can't substantially span the width because it's seated on the end plate. It doesn't address the argument that it can't substantially span because it is seated within the disc capsule. And you can see that vividly at figure 11 of the Brantigan patent. And you can see that in... You have the appendix site for that. I don't have it readily. It's, yes, it's at A510 and you can also find it at page 62 of the red brief. And you see that there are these fibers that remain in place at the apotheosial ring that are not cut away. And therefore, it can't substantially span the full width. Well, it can't span the full width. It certainly can't. The question is what substantially means in this context. Well, and what the board... I mean, one could look at figure 11 and say, well, that's most of the width. Well, the board didn't address this issue. What the board simply said was, well, because we find that it is, quote, generally shaped and sized to conform with the disc space, the one sentence from column four of Brantigan, and it literally appears once in Brantigan, that was the board's answer to every single argument that was made, not addressing the inconsistency that would create with the fact that you have something that is bottomed on the end plate, can fit within the disc capsule, and it is grooved on the periphery in order to allow tissue ingrowth. It's undisputed, that can't happen out on the apotheosial ring, on the extremities. Where that happens is actually on the end plate itself. I see that I'm well past my time. Yeah, I don't care from the government. We'll restore two minutes of your time. Thank you. Ms. Lateef. Good morning. May it please the court, I find myself in sort of an awkward position here because we didn't brief these issues. I specifically intervened on the motion that was dismissed, but I did want to make myself available to answer any questions that the court might have in defending the board's final written decision. My first question to you would be, do you adopt, or that may be an overly formal term, do you agree with the position taken in Nuves' brief with respect to the cross appeals? We agree with the results of that brief. I mean, every argument we may have argued differently, but absolutely we agree in supporting the board's final written decision in that the board probably found that the claims were unpatentable, yes. Could you address, before you get to the point that your opposing counsel spent most of his time on, could you address the Claim 17 issue that I asked him about? The question of whether the positioning rods are... The anchor wires. Yes, the anchor wires are above, are positioned above the vertebra. I mean, let me say by way of introduction that it seemed an odd notion, as was argued by Nuves' to say that those anchor wires are above the vertebra when the only respect in which they appear to be above, at least in the figure, is the very bottom of the vertebra that's at the other end of the entire disc capsule. Right, so to respond to you, if you can indulge me for a little bit, because it's kind of new to me, but I think what the board ended up saying on that was that they adopted that doesn't have to be directly positioned over. And those wires, if you look at Figure 5, which is the annotated version of the A268 and the originals at A479, those wires do sit, even if it's just above a little piece, that part of the vertebrae. And so the board at A23 found that that figure was enough and that Morslau didn't do anything to prove otherwise, essentially. I mean, it was a short paragraph, but they're basically saying we adopt this annotated version and Morslau hasn't given us any evidence to the contrary. And so they found that Claim 17 was meant by... Yes, the evidence to the contrary is that what they appear to be above is the disc capsule. I'm not sure I'm using the right terminology there, but it's the disc material as opposed to vertebral material. Well, but it's... Just give me one second, Your Honor. As I understand it, the idea in Jacobson is that you want those pins to go into the disc material. You're not interested in clearing out the entire disc. You can operate inside the two pins. And those pins are going into the disc. They're not going all the way through. They go all the way down into the vertebrae at the other end, as I understand it. So functionally, it's performing a different role. Right. But based on the way it's claimed, the claim is pretty broad. And the claim says positioned over. And so based on the claim language that the board has to work with, it found that it agreed with the petitioner's position and that they were... If you look at it, it is sort of over the endpoints of the vertebrae, but that is the vertebrae.  Possibly. And so to the extent, Your Honor, would like me to address sort of some of the substantial points, I'd like to say that the board relied on more than just one sentence in Brantigan to account for all the implant size limitations. While it did repeatedly talk about how Brantigan discloses that it's shaped and sized to conform with the disc space, it also looked at all the other things that were mentioned in other parts of Brantigan where it talks about that the implants are dimensionally similar to non-vertebrae bodies, excuse me, and that the implants are, to quote, bottomed on the hard bone faces or end plates of adjacent vertebrae. This sort of goes to what counsel for Warsaw was arguing. And in addition to that, the board makes it really clear that this notion of substantial, quote, substantially spans, it talks about it just has to mostly span. And what substantial is, Warsaw's counsel was trying to make an argument for, but that's just attorney argument. The board said even if it's a little bit not the full width, that's okay, because it's an insubstantial amount. And so it looked to basically shape and size to conform pretty much fits what the claims are arguing for. What was the evidence that the problems with either approaching from the front or approaching from the rear prior to the invention were recognized and that lateral approaches for any purpose was lateral approach which was recognized as a preferable approach? Other than, I guess, Jacobson for limited purposes that Jacobson employed that approach. But what else is there in the evidence, if anything? I would turn to Jacobson. To the extent there's more than that. But Jacobson doesn't, I guess, talk about the problem with the spinal column in the aorta, right? The nerve in the aorta. Right, but this is an obvious misrejection, right? And so if you combine the references, someone could see that it would make more sense to, or not make more sense, but that it could be done laterally. It could be done, but the question ultimately is why would they have had a motivation to do it laterally? Jacobson did, but did Jacobson do it? Is there any indication that Jacobson was doing that because of the more generalized problem of the aorta and the spinal nerve? Or was it for idiosyncratic reasons associated only with Jacobson and not generalizable to disc replacement, for example? Well, so I can tell you when the board looked at the motivation, sure. When the board looked at the motivation to combine, they relied on the findings that the petitioner stated. And one of those was basically that you would combine these references so that the implant extends, I have to read from it to remember, longitudinally across nearly the full disc space and advantageously reduce the likelihood of the implant collapsing into the soft cancellous bone in the central region of the vertebrae. So as far as also combining Jacobson and Liu is to widen surgical access path from the initial needle in a manner that reduces trauma to the intervening tissue. So those were, the board at 823, while it maybe had one sentence, it was basically pointing to those reasons of combining the references and found that they were persuasive. And so, again, I thank you for being a little bit understanding in terms of my knowledge of the case. But we stand behind the board's final written decision, and I respectfully ask this court to affirm the board's decision. If there are no further questions, I yield my time. Thank you. Thank you, Chief Judge Prost. Judge Bryson, your understanding of Jacobson is correct. It's a limited patent addressing disectomies. Jacobson was focused on avoiding the lamina. It doesn't mention implants at all, and indeed the board conceded as much at A15. And the approach to position over, you're absolutely right. It's positioned over the disk material. The whole point is to create an operating channel, and the board doesn't give any reasoning to why that limitation would be met here. And it doesn't even say that it's adopting new basis reasoning, although it appears to be, but that essentially would frankly be absurd. The other thing I would note... That may be a little strong, don't you think? Well, I mean, at that point... It strikes me as the most natural reading might be that what it is above is it is above the disk material, but it is also above the rest of the patient. I was going to say, and at that point it's above the operating table and above the floor and above the granite. But I think one of the things that you saw in the board's defense today is a bit of flipping the burden of proof. They say Warsaw didn't do anything to prove otherwise, but of course the burden was always on Nuvasiv to show that this was not amenable. Another point from the board's argument today, the board doesn't adopt wholesale Nuvasiv's reasoning. And I think that's a telling because the board didn't do that at A23 either. And in fact, there are many points within the board's decision that are actually inconsistent with what Nuvasiv had argued. And so what you're left with is it agrees with the conclusion, but that's just a conclusion and that's not enough to satisfy the standards for obviousness. In terms of Brannigan itself, it's a different philosophy. It says that it is bottomed on the end plate, and the board fundamentally doesn't understand the significance of that or what it means. And if you look at the figures on page 9 of the red brief, you see the distinction between the end plate and the apotheosial ring. And something that is bottomed on the end plate isn't seated across the apotheosial ring. And at the end of the day, the board did not say that it was reading the apotheosial ring as being not substantial. It read Brannigan as actually reaching the apotheosial ring and just can't square that with the actual disclosures in Brannigan itself, fundamentally that it can sit within the disc capsule and is bottomed on the end plate. I see that I'm past my time if the court has further questions. Can I ask one more question? Certainly. On that last point, specifically the board's misreading of Brannigan, can you point me to the place in the board's opinion, you touched on this earlier, but I just want to make sure I have it, where you say that the board misread Brannigan on that point, the point you just last made. I believe it's at A20 where the board says that Brannigan would have reached the apotheosial ring and you can't square that with the disclosure. Where is that specifically on A20? I believe it's in the paragraph where it says the patent owner does not show persuasively that any such errors in figure 11 are futile. You're on the right. I'm sorry. Oh, I see. Okay. I think that's what he's talking about. Are you talking about the middle of the first paragraph? Yes, Chief Justice. Okay. I don't see any reference to the apotheosial ring. Am I missing something? No. Judge Bryson, I don't have it at my fingertips. I know there's... A19. Oh, I'm sorry. A19. This is a patent owner does not show persuasively that Brannigan expressly teaches that the implant sits within the apotheosial ring and it goes on and it says we therefore agree with the petitioner that one of ordinary skill in the art would not have... There's a double negative here, but would not have understood that Brannigan discloses an implant that would not extend into the disk space encompassed by the apotheosial ring. And that gets to the inconsistency with the notion that you have an implant that is said repeatedly. It's throughout the claims. It appears at three places on A511, 513, and 514 that sits on or is bottomed on the end plate. And those are just inconsistent. Thank you. Before we conclude, however, I guess we're sort of in our unusual situation, although we have provided for additional briefing in certain circumstances. So I wanted, the panel wanted to extend to Mr. Lateef in the office to at least raise the question about whether or not you would be receptive or want to do some additional briefing in this case. Your Honor, if it would help the court, we'd be happy to do that, but we are okay with resting on the argument. Okay. Thank you for that. Great, great. Thank you. We thank both counsel. The case is submitted.